65 F.3d 169
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lloyd HAWTHORNE, Defendant-Appellant.
 No. 94-5701.
 United States Court of Appeals, Sixth Circuit.
 Aug. 31, 1995.
 
 Before: JONES, NELSON, and RONEY, Circuit Judges.*
 PER CURIAM.
 
 
 1
 Defendant Lloyd Hawthorne is appealing his convictions for conspiring to possess with the intent to distribute cocaine in violation of 21 U.S.C. Sec. 846 (1988), aiding and abetting in the possession of approximately five kilograms of cocaine with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) (1988) and 18 U.S.C. Sec. 2 (1988), and travelling in interstate commerce with intent to promote narcotics trafficking activity in violation of 18 U.S.C. Sec. 1952(a)(3) (1988 & Supp. V 1993). Hawthorne claims that his convictions were based on insufficient evidence. We affirm.
 
 I.
 
 2
 On November 3, 1992, agents of the narcotics interdiction unit at the Cincinnati/Northern Kentucky International Airport were watching passengers depart from a Delta Airlines flight arriving from Los Angeles, California. Prior to the arrival of the flight, the agents obtained a list of passengers transferring from the flight to outbound flights. Upon reviewing the list, Officer Evans noticed the name Shirley Jones, and he recognized the name as that of a popular actress. Evans noticed a woman leaving the plane, whom he described as looking "scruffy" and "grubby." She walked up to the Delta agent and asked for directions to the Detroit Flight. Evans knew that only two people were connecting to the Detroit flight, Shirley Jones, and a person named Mark Johnson. Therefore, he determined that this woman had to be Shirley Jones.
 
 
 3
 After watching the balance of the flight deplane, Evans obtained Jones' ticketing history from a Delta agent. He found that she was flying on a cash, one-way ticket from Los Angeles and was transferring to a flight bound for Detroit, Michigan.
 
 
 4
 Along with other officers, Evans proceeded to the holding area for Gate 11, the point of departure for the Detroit flight. Evans sat down next to Jones, identified himself, and asked if he could speak to her, and she agreed. During a short conversation, Evans discovered that her actual name was Shirley Thornton, not Shirley Jones. She produced a California operator's license in the name of Shirley Thornton and told Evans that she was travelling to Dearborn, Michigan. Thornton agreed to a search of her carry-on and checked luggage and asked that it be done in an adjoining break room. There, the agents searched her carry-on bag and only personal items were found. Again the agents asked Thornton if they could search her checked luggage, and she agreed. Officer Carl Parker left to find the luggage and search it.
 
 
 5
 Thornton left the break room and returned to the terminal. Evans followed, and on the way back to the holding area, Officer Joe Jones stopped him. Officer Jones pointed out Defendant Lloyd Hawthorne and stated that he (Jones) had been watching Evans' encounter with Thornton. Officer Jones noticed that when they walked toward Hawthorne and past him, Hawthorne watched them very intently and turned completely around in his seat as they passed. Hawthorne held this position for approximately twenty seconds.
 
 
 6
 Evans approached Hawthorne and spoke to him. Upon reviewing Hawthorne's ticket, Evans found out that he was flying in the name of Mark Johnson. Evans also noted that Hawthorne's ticket was a cash, one-way ticket from Los Angeles to Detroit. Upon request, Hawthorne permitted agents to search his carry on luggage, but nothing significant was found.
 
 
 7
 At this point, Evans received a message on his pager stating that Officer Parker had found a quantity of narcotics in Thornton's checked luggage. Evans proceeded to the flight ramp, where he found Thornton's bags open and five kilograms of cocaine inside. Thornton was arrested, but Hawthorne flew to Detroit, Michigan.
 
 
 8
 After Hawthorne left for Detroit, Evans contacted the interdiction unit at the Detroit Metropolitan Airport and spoke to Officer Wayne Bullen. Evans told him what occurred at the Cincinnati Airport and advised him that Hawthorne would be arriving in Detroit. Bullen observed Hawthorne at the Detroit airport, when he deplaned. Hawthorne walked through the airport, entered a taxi, and went to a motel in a suburb of Detroit known as Southfield.
 
 
 9
 Later that evening, Bullen and other members of the task force went to Hawthorne's room at the motel and asked to speak to him. Hawthorne agreed. After reviewing Hawthorne's ticket, Bullen asked Hawthorne why he was in Detroit. Hawthorne indicated that he was visiting friends for a few days. Bullen asked him if he knew anyone by the name of Thornton, and Hawthorne stated that he did not. Bullen also asked Hawthorne if he had been travelling with anyone on his flight to Detroit, and he stated that he was travelling alone. Hawthorne denied asking anyone to carry luggage for him. Bullen also saw Hawthorne the following morning at the airport. Bullen again spoke to Hawthorne, searched his luggage, and found nothing.
 
 
 10
 Later that same day, Evans reviewed the flight history for Mark Johnson, a/k/a Lloyd Hawthorne. As he had discovered when viewing Hawthorne's ticket in the terminal, Evans noted that it was a cash, one-way ticket. It had been purchased at the same place as Shirley Jones' ticket, and had the same call back number as Shirley Jones' ticket. The Delta airlines reservationist that sold the tickets to Thornton and Hawthorne was Beverly Bodkin. She recalled that when Hawthorne bought his ticket, she asked him for a name. His response was "Jones" before correcting it to "Johnson." Hawthorne's ticket was purchased at 12:51 p.m. at Bodkin's ticketing office located in the Del Amo shopping center, and Thornton purchased her ticket at 1:31 p.m. Bodkin recalled both Hawthorne and Thornton and believed that they were travelling together. The tickets had identical itineraries, and the telephone contact number was the same.
 
 
 11
 Evans testified that some of these characteristics such as the cash, one-way nature of the tickets, were significant because 97-98% of those persons found with drugs are using cash, one-way tickets. Further, Evans testified that experience had taught him that it was very common for couriers to use a false name.
 
 
 12
 Upon being arrested, Thornton did not mention Hawthorne's involvement until she conferred with an attorney. At that point, Thornton told the officers that the bag and its contents, five kilograms of cocaine, belonged to Hawthorne and that she was travelling with him and had checked the bag onto the flight for him. Thornton told officers that she lived in Los Angeles, California, and had known Hawthorne for at least two years.
 
 
 13
 Thornton recalled that on November 3, 1992, Hawthorne had invited her to breakfast. At breakfast, he told her that he was going to Detroit and asked if she would like to accompany him, and she agreed. While at the restaurant, Thornton made a reservation with Delta airlines for the trip. She did not make a reservation for Hawthorne because he told her that he already had a reservation. Upon leaving the restaurant, Thornton and Hawthorne went shopping for a coat at the Del Amo shopping center. While Thornton looked for a coat, Hawthorne left her for approximately twenty to twenty-five minutes. Upon returning, Hawthorne informed Thornton that Delta Airlines had a ticket counter in the shopping center and that she could pay for her ticket there. Thornton proceeded to purchase a ticket in the name of Shirley Jones, and she paid for the ticket with money that Hawthorne supplied. She used her pager number as a telephone contact number.
 
 
 14
 Later that same evening, Thornton called Hawthorne, and Hawthorne told her that he would pick her up at 10:00 p.m. in the lobby of her apartment building. Hawthorne arrived at 10:15 p.m. He told Thornton he was in a hurry, and Thornton agreed to take a shuttle to the airport. Hawthorne also asked Thornton to check his bag with hers, and again, she agreed. Upon arriving at the airport, Thornton checked her bags at the curb with a Skycap and put the name "T.A. Blake" and a telephone number on the bags. She used this name because "T.A. Blake" was a name that Hawthorne had used in the past.
 
 
 15
 From there, Thornton proceeded to the holding area for the flight, and the gate agent paged her. She approached the gate agent, who inquired regarding the luggage with the name "T.A. Blake" on it. Thornton told the agent that the bags were hers.
 
 
 16
 Thornton claimed that she did not see Hawthorne until some time during the flight to Cincinnati. She told him about her conversation with the gate agent, and Hawthorne told her not to worry about it. She allegedly asked him if there was anything she should know, and he told her there was nothing she should know. After asking the question a second time and receiving no answer, she asked him if the bag contained drugs. Hawthorne told her the bag contained a couple a packages, and he told her not to worry about it. He then allegedly grabbed her wrist and told her that if she caused any problems, she would not have to worry about herself but that "... there was her mother and son." Hawthorne told her that once the luggage arrived in Detroit, she would not see it again and that someone else would pick it up.
 
 
 17
 Thornton recalled deplaning, walking to the holding area for the Detroit flight, and speaking to Officer Evans. She said she agreed to let him search the bags because she was not sure that they contained drugs. She suspected it but did not want to bring suspicion on herself by refusing to permit the search of the bags.
 
 
 18
 On December 17, 1992, Thornton and Hawthorne were indicted for conspiring to possess with the intent to distribute cocaine in violation of 21 U.S.C. Sec. 846, and aiding and abetting each other in possessing approximately five kilograms of cocaine with the intent to distribute it in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. Furthermore, Hawthorne was charged in count three with travelling in interstate commerce with the intent to promote narcotics trafficking activity in violation of 18 U.S.C. Sec. 1952(a)(3).
 
 
 19
 Hawthorne was arrested in Los Angeles, California, on April 7, 1993, and was arraigned in the Eastern District of Kentucky on April 26, 1993. Due to evidentiary problems, the Defendants were tried separately, and on October 5, 1993, Shirley Thornton was acquitted. With respect to Lloyd Hawthorne, however, trial commenced on January 3, 1994, and on January 5, 1994, the jury returned a verdict of guilty on all counts. Hawthorne was sentenced to 141 months in prison, and this appeal followed.
 
 II.
 
 20
 We have carefully reviewed the facts and evidence. Moreover, we have applied this court's controlling standard of review for challenges based on the sufficiency of the evidence. United States v. Blakeney, 942 F.2d 1001 (6th Cir.1991), cert. denied, 502 U.S. 1035 (1992). We conclude that the evidence is sufficient to support the conviction. We, therefore, AFFIRM the conviction of Appellant Hawthorne on all three counts.
 
 
 
 *
 The Honorable Paul H. Roney, United States Circuit Judge for the Eleventh Circuit, sitting by designation